[Crim. No. 6302.    Second Dist., Div. Three.    July 29, 1959.]

THE PEOPLE, Respondent, v. FRED J. BARTON,
Appellant.

Harry Weiss for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Ernest E. Sanchez, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendant was accused of assault with intent to commit murder, a violation of section 217 of the Penal Code. In a nonjury trial, he was convicted of assault by means of force likely to produce great bodily injury (violation of Pen. Code, § 245), a lesser offense necessarily included in the offense charged. Proceedings were suspended and probation was granted. Defendant appeals from the "sentence" wherein he "was sentenced to six months in the County Jail and placed on four years' probation." He also appeals from the order denying his motion for a new trial.

Appellant asserts that the judgment should be reversed because the prosecution failed to establish guilt beyond a reasonable doubt.

Patricia McKeown testified that on February 14, 1957, about 11:30 a.m., when she entered her home and went into her bedroom, the defendant came out of a closet, which was in that room, and grabbed her; she got away from him and ran to a place which was about three feet from the front door; then defendant caught her and dragged her through the bedroom, through the bathroom, and into the den; then he pushed or threw her onto the floor, sat on her and "pinned down" her arms so that she could not use them; during that time she was trying to get away from him; he had a bottle with yellow capsules in it; he held her nose so that she would have to open her mouth in order to breathe; when she opened her mouth to breathe he put pills in her mouth; he had his hand over her mouth, and he pushed the pills in in handfuls and she tried to spit them out, and he would push them back again; he had some water in a glass; he got the water from the bathroom; the bathroom was next to the den and he held her and got the water; he tried to force the pills down with the water; "I was forced to swallow quite a few of them, I imagine"; he forced capsules down her throat; after a period of approximately 15 minutes, he dragged her into the bedroom, pushed her down on the bed, and said that he was going to sit there until he was sure she was gone; about two minutes thereafter, her son (about 8 years of age) came home from school; then defendant ran out of the house; she was getting a little groggy and she went to the bathroom and tried to get the pills out; she vomited some of it; she was getting sleepier or dizzier; she tried to call her mother by telephone but evidently passed out because that is the last she remembered until she awakened in a hospital.

She testified further that the house, above referred to, was

her mother's house and that she (Mrs. McKeown) had lived there with her mother during the past three and one-half years; she (Mrs. McKeown) had known defendant about five years; defendant had not been in her mother's house during the year preceding the incident here involved (the year preceding February 14, 1957, but during that time he had been in the yard several times; he had lived in that house for approximately a year prior to February 14, 1956 (that is, prior to year next preceding the incident here involved) ; after that incident she had seen the defendant in her back yard.

She testified further, in response to questions on cross-examination, that since February 14, 1957, she did not ask defendant to come to her yard; she did not go to his place of business and speak to him; she did not go to his home about 4 a.m. or about 11 a.m. on February 14, 1957; she never lived with defendant as man and wife.

Mr. Breul, called as a witness by the prosecution, testified that on February 14, 1957, about noon, while he was driving his automobile on Cahuenga Boulevard, he saw defendant running very fast out of a driveway at 4916 Cahuenga Boulevard (the driveway at the house where Mrs. McKeown lived) ; defendant ran across the boulevard in front of the witness' automobile, and the witness had to apply the brakes to avoid hitting defendant; the witness hollered at defendant; when defendant was at the corner on the opposite side of the street, the witness saw him duck behind a garage; the witness stopped, and then he saw the defendant "stick his head out from behind the garage"; the witness turned his automobile to the left, double parked it, and started to open the door; then the defendant ran to a nearby Mercury automobile and jumped into it; the witness asked him what he was doing; defendant said that he had just found his "old lady with a nigger"; then defendant drove away; about 5 or 10 minutes after the defendant ran out of the driveway, the witness and a police officer entered the house; he (witness) did not call the police; Mrs. McKeown was lying on the floor, with a pillow under her head; it did not appear to him (witness) that Mrs. McKeown had been in a physical struggle; he did not see any bruise on her; he had never seen her before that time, and since that time he had seen her only in the courtroom.

Mrs. Stevens, called by the prosecution, testified that on said February 14, about noon, while she was in her yard across the street from 4916 Cahuenga Boulevard, she saw the

defendant "burst out of" the front of Mrs. McKeown's house, and saw him run "right in front of this man" in the automobile.

Dr. Sotolov, a doctor of medicine, called as a witness by the prosecution, testified that on February 14, 1957, he was on duty as a physician at an emergency hospital; about 1 p.m. of that day Mrs. McKeown was brought to the hospital in an unconscious condition; he had the impression that she might have barbituric poisoning; he pumped from her stomach an amber colored fluid, containing an undissolved white powder material; in his experience as a physician, the fluid and powder material indicated nembutal capsules; in his opinion the fluid contained nembutal; he was impressed "with the number of capsules that this individual must have had in her stomach for the strong amber color of the fluid"; nembutal is a fast acting substance, and in his opinion a nembutal capsule, in the stomach, will dissolve within approximately a minute; in his opinion, if her stomach had not been pumped at that time, the nembutal would have been fatal to her.

Officer Morlan testified that on said February 14 he saw Mrs. McKeown at the receiving hospital; her stomach was pumped while she was there; from the ambulance attendant, he (officer) received a solution that had been taken from her and the solution was in a vial and it was a yellowish colored liquid with a white powdery substance at the bottom; he "booked" the vial and its contents as evidence at the police station. The vial, with its contents, was marked Exhibit 1 for identification. The officer testified further that the vial (Exhibit 1 for identification) was the vial he received at the hospital.

Ray Pinker testified that he is a forensic chemist employed in the investigation laboratory of the Los Angeles police department; he analyzed the contents of said vial and found that the barbituric drug nembutal was present; he performed tests regarding the time required for nembutal capsules to dissolve; in a test which in his opinion "most closely is equivalent to a capsule in the human system," a nembutal capsule dissolved within a period of 65 to 75 seconds.

Defendant testified that he operated a parking lot, which is next to a restaurant; he had lived with Mrs. McKeown as man and wife about six years; they lived as husband and wife while they were living at her mother's house, and while her mother and son were there; he moved "out of the house" about two years ago; since that time she has been following him; on

February 14, 1957, about 4 a.m., she knocked on the door of his apartment (which apartment was next to the parking lot), and he opened the door; she asked what was going on; he said, "We are just throwing a ball" (he was having a party there—about 15 persons were present); he told her that she could not come in; she slammed the door and went away; then he went into the shower; he left his clothes on a chair outside the bathroom door; about 15 minutes later she cut the screen (of the kitchen door) and opened the door; she "sliced down" his clothes with a razor blade; about 11 a.m. of the same day (February 14) she came to a place where he was putting a roof on a building; at that place she said that she did not know why they could not understand each other, and she also said, "Let's go and have lunch"; he said, "O. K."; she invited him to come to her apartment; he arrived at her home, on that same day about 11:30 or 11:45 a.m., and he knocked on the door and the door went open; he "just stepped in one step," and he saw that she was gagging, and that her face was foamy; he asked what was going on; she said she had taken some poison, and "I am going to tell them you did it"; she also said, "I told you in front of these people." (At that point in his testimony he said that, on the previous night at the party, she had said, "I will get you one way or another.") He testified further that (when he was at the door and saw her gagging) he got frightened, and he went out of the place right away—he "took off out the front door"; he was frightened because he "had a Peace Bond out against me [him] from going to see her"; and he had "told the court people at Van Nuys—I promised I wouldn't go near the woman"; he did not bring any nembutal to the house that day; he did not push any nembutal pills down her throat; he did not sit on her and force her mouth open with one hand and force pills down her throat with his other hand; he was not trying to make her drink water while he was sitting on her. He testified further that he was arrested on this charge on February 15 or 16; since said February 14, he had seen Mrs. McKeown about a dozen times—at the parking lot, her home, and his home; he had resumed relations with her; about April, 1957, she drove her automobile into the parking lot, and on that occasion he went with her in the automobile to a place on the lot where they had sexual relations. He also testified that, before he was accused of this crime, she had accused him of robbery, burglary, rape, and kidnaping.

On cross-examination, defendant testified that he did not tell any officer, at the time of the arrest or afterward, that she had cut his clothes; he did not talk to anyone when he was starting to run; he did not see a man, known as Mr. Breul, when he ran out of Mrs. McKeown's apartment on that day; he did not say to "this person" that he had just found his "old lady with a nigger"; he did not know Mr. Breul; after leaving her house, defendant got his "truck" and went home; he went back to his work after he had lunch; he did not report to anyone that a lady, at the Cahuenga address, had taken poison; the reason he did not make a report was that he had seen this act before; she had tried to commit suicide before; he thought the foam was a part of the act, and he had seen her do that before, but he was frightened.

At the beginning of the trial, it was stipulated that the case of the People might be submitted on the transcript of the preliminary hearing, and that further evidence might be presented. Mr. Breul had testified at the preliminary hearing.

On redirect examination (at the trial), defendant testified that, after the preliminary hearing, Mr. Breul came to defendant's parking lot and told defendant that he (Mr. Breul) had been bribed to testify against defendant; defendant did not ask, and did not know, who bribed him. On recross-examination, defendant testified that Mr. Breul told him that Mr. Breul's testimony at the preliminary hearing was false, and that it was the result of being paid money by Mrs. McKeown; defendant did not report that conversation to the police because he did not want to get in deeper. Then defendant testified, "I will take a lie detector."

Miss Peterson, called as a witness by defendant, testified that she was at the party at defendant's apartment on said February 14; she thought she saw Mrs. McKeown there; and "I do remember her arriving."

Miss Brown, called by defendant, testified that she was at the party on February 14; she did not see Mrs. McKeown there, but she heard the voices of defendant and Mrs. McKeown; those persons were hollering; the witness heard a man say, "My clothes were all cut."

Miss Webb, called by defendant, testified that she is an employee of the restaurant which is next to the parking lot; she saw Mrs. McKeown arrive at the party about 4 a.m., and saw her kick the screen door and force her way into the kitchen; defendant pushed her out the door, and then he went into the living room; on occasions before and after February

14, Mrs. McKeown called the restaurant and asked for defendant; when he answered the telephone, she would "hang up," and then call again.

Mr. Taylor, called by defendant, testified that he saw Mrs. McKeown drive an automobile into defendant's parking lot in April or May, 1957; she and defendant went, in the automobile, back of a building on the lot; they returned about 15 minutes later; then she drove away from the lot.

Miss Moore, called by defendant, testified that she resided in an apartment above the apartment where defendant resided; she had seen Mrs. McKeown go to defendant's apartment after February 14, 1957.

Mr. Weiss, one of the attorneys who represented defendant at the trial (and who represents him on this appeal), testified that he represented defendant in the municipal court in Van Nuys about eight months prior to said February 14; Mrs. McKeown had signed a complaint charging this defendant with disturbing the peace and with assault and battery; probation was granted; the judge of that court said, in effect, to defendant and Mrs. McKeown that if they wanted to live together they should get married, and that one of the conditions of probation was that he was not to see or be around her unless they made their relationship legal by getting married.

On rebuttal, the mother of Mrs. McKeown testified that she (witness) purchased the premises at 4916 Cahuenga Boulevard in 1953; the witness, her daughter, and her grandson have lived there since that time; during part of that time, the defendant slept in the garage on the premises, and when it was too cold he slept on the davenport in the living room; defendant never lived there in the relationship of husband and wife with Mrs. McKeown; on February 14, 1957, the witness was at work, away from home; on the previous evening Mrs. McKeown was at home all evening.

On rebuttal, Mr. Breul testified that he never stated to defendant that the testimony which he (Mr. Breul) gave at the preliminary hearing was false; he (witness) had not seen the defendant since the preliminary hearing, other than in the courtroom.

As above stated, appellant asserts that the prosecution failed to establish guilt beyond a reasonable doubt. He argues that a statement by the judge, after the evidence had been presented, indicates that the judge had a reasonable doubt as

to the guilt of defendant. The statement, quoted by defendant in that connection, was as follows: "It appears to be a stalemate as far as the evidence is concerned, because he categorically denied forcing pills down her throat. It is something that will have to be determined outside of this evidence." That statement was part of a discussion (among the attorneys and the judge) as to whether the defendant and Mrs. McKeown would submit to a polygraph (lie detector) test. After the People and the defendant had rested the case, the deputy district attorney said: that the defendant had indicated from the witness stand that he would submit to a polygraph test; that he (deputy) had discussed this matter with Mrs. McKeown (as to whether she would submit to such a test), and that she would submit to the test under conditions to be arranged through the court; that Mr. Pinker would be willing to give the tests to defendant and to her. Then the judge said: "This is the most bizarre case I have ever heard . . . the defendant . . . says that this gentlemen [Mr. Breul] . . . approached him and told him in the parking lot that he had been bribed to testify as to these matters and then he [Mr. Breul] categorically denied that he talked to or ever met the defendant or saw him, and after the evidence was admitted, then they come in and they make the defendant out to be a theoretical perjurer." Then the judge made the above statement which defendant asserts indicates that the judge had a reasonable doubt as to defendant's guilt. After making said statement, the judge continued his remarks, as follows: "What occurred there, I will have to pass on, and I have the testimony before me. Of course both sides would have to stipulate to this [polygraph tests]." The deputy said that he would so stipulate. One of the attorneys for defendant said that he did not remember that anything was in evidence about a polygraph. The judge said that the defendant, while he was on the witness stand, had said that he would take a lie detector test. One of the attorneys for defendant, after stating that the judge had expressed some apprehension about the truthfulness of defendant, asked: "How about the truthfulness of the complaining witness?" Thereupon the judge said: "I said a polygraph test of both of them might be of assistance in determining the truth of the stories. We have conflicting evidence as to their stories as to what took place and the People have some very convincing corroborating evidence as to what happened here insofar as the occurrence is concerned, and yet the defendant denies it very vociferously."

One of the attorneys for defendant said that the offer of the stipulation came as a surprise, and he wanted an opportunity to discuss it with his client. After a recess, the attorney for defendant said they would so stipulate. The trial was continued for about two weeks in order that the tests might be made. When the trial was resumed, after such continuance, one of the attorneys for defendant made a statement to the effect: that when he entered into the stipulation he was apprehensive that, if he refused to so stipulate, it might be contended that such refusal indicated guilt on the part of defendant; that it was improper for the deputy district attorney to suggest such a stipulation; that he (attorney) understood that Mr. Pinker had not made the tests, but that someone else had made them; that he (attorney) did not know the results of the tests, but he felt that he should not be bound by the stipulation. The deputy said that it was the defendant's suggestion that started the matter regarding the tests; that he (deputy) did not know the results of the tests; and, in view of counsel's statement, he was willing that the tests be disregarded. The judge said that the defendant, as a witness, had stated that Mr. Breul had come to defendant's parking lot and told him that he (Mr. Breul) had been paid to perjure himself at the preliminary hearing. The judge also said that Mr. Breul had testified that he did not know the defendant or Mrs. McKeown; that he was an accidental witness to this whole procedure; and that everything that he told was the truth. The judge said he believed Mr. Breul, and he was willing to disregard the entire matter regarding the tests; that he had read the report as to the tests, but it did not affect him at all; and that it would not interfere with his opinion. The report was not received in evidence.

It thus appears from the whole context of the remarks of the judge, in connection with the discussion as to polygraphs, that the part of his remarks as to a stalemate in the evidence related to the conflicting stories of the defendant and Mrs. McKeown; and that the part of his remarks to the effect that it was something that would have to be determined "outside of this evidence" also related to that conflict in the evidence. The circumstances under which the remarks were made show that the remarks were not applicable to all the evidence presented by each side. It is to be noted that, shortly after making the remarks just referred to, the judge said: "We have conflicting evidence as to their stories [defendant and

Mrs. McKeown] as to what took place and the People have some very convincing corroborating evidence as to what happened here insofar as the occurrence is concerned, and yet the defendant denies it very vociferously." Also it is to be noted that, with reference to defendant's testimony concerning Mr. Breul, the judge said that he believed Mr. Breul.

At the time of announcing his decision, the judge said: "[T]here is no doubt in my mind that this fellow was there for no good reason, and there is no doubt in my mind that he wasn't telling the truth on the stand . . . . What strikes me in the testimony of this witness Breul is that the defendant states he perjured himself or fabricated this whole story, even though this fellow saw him running out of the house and almost running him down and getting into a Mercury car that was stopped by the complaining witness' house; had words with the defendant, but there is also the physical aspect here that it would be difficult to understand how this woman would be forced to take the Nembutal tablets. I have no doubt, though, that he choked her in this matter. I am going to find him guilty of the necessary included offense of assault by means of force likely to produce great bodily injury. I think there is certainly sufficient evidence to warrant that in this case."

The contention to the effect that the judge had a reasonable doubt as to the guilt of defendant is not sustainable.

Appellant also asserts that there was no evidence "as to a 'choking' of the alleged victim." It is true that there was no evidence that he placed his hands on her throat. There was evidence, however, that while she was lying on her back on the floor and he was sitting on her, he held her nose so that she would have to open her mouth in order to breathe, he had his hand over her mouth, he pushed many pills into her mouth, and he tried to force the pills down with water. Also, there was evidence (testimony of her and her mother) that it was difficult for her (prosecutrix) to swallow pills. The verb "choke" is defined, in Webster's Unabridged Dictionary, second edition (1950), as follows: To render wholly or partly unable to breathe by filling or pressing the windpipe, by stopping the supply of breathable air, or by other means, or to kill by so doing; to stifle, to strangle; . . ." The evidence was sufficient to support the finding that defendant choked her.

Appellant seems to argue further that since the judge did not find him guilty of assault with intent to commit

murder (the offense charged), and since the judge said "it would be difficult to understand how this woman would be forced to take the Nembutal tablets," the judge disbelieved her testimony that appellant forced or attempted to force her to swallow the pills. The fact that the judge did not find appellant guilty of assault with intent to commit murder would not necessarily mean that the judge did not believe her testimony that appellant put pills in her mouth and attempted to force her to swallow them. The statement of the judge was that "there is the physical aspect here that it would be difficult to understand how" she would be forced to "take" the pills. That was a statement to the effect that it would be difficult, from the physical aspect of the alleged occurrence, to understand how she could be forced to swallow the pills. It was not a statement that it would be difficult to understand that he put pills in her mouth and tried to force her to swallow them. As above indicated, appellant's argument to the effect that the judge disbelieved the prosecutrix' testimony, regarding an attempt to force her to swallow pills, seems to be conclusions of appellant based principally on the fact that the judge did not find him guilty of assault with intent to commit murder. Any question as to whether the judge found that appellant attempted to force her to swallow pills is settled by a statement which' the judge made when he was considering the application for probation. At that time the judge said: "On this occasion, she didn't seek him out. He [appellant] went over there and *choked her and tried to push these pills down her throat.*"

In summary, with reference to some of the statements of the judge when he announced his decision and when he considered probation, the judge said that there was no doubt in his mind that appellant was not telling the truth regarding Mr. Breul; that there was no doubt that appellant choked the prosecutrix; and that appellant tried to push the pills down her throat. The statement of the judge that "On this occasion, she didn't seek him out" is tantamount to a finding that appellant was not telling the truth when he testified that the prosecutrix invited him to her home. The judge also said, as above shown, that he believed Mr. Breul. The lady who resided across the street, from the house of the prosecutrix, corroborated Mr. Breul—she saw appellant "burst" out of the house and run in front of Mr. Breul's moving automobile.

The questions as to the credibility of the witnesses

and the weight of the evidence were questions of fact for the determination of the trial judge. ██ An assault by means of force likely to produce great bodily injury may be made by the use of the hands. (*People* v. *Bumbaugh*, 48 Cal.App. 2d 791, 797 [120 P.2d 703].) ██ "What force is likely to produce great bodily injury is a question of fact to be determined by the jury [trier of the facts]." (Ibid.) In the present case, the evidence was sufficient to support the decision of the trial judge wherein appellant was adjudged guilty of assault by means of force likely to produce great bodily injury.

██ Appellant contends further that the deputy district attorney was guilty of misconduct "by initiating a stipulation that the accused and the complaining witness submit to lie detector tests." Appellant also contends that there was misconduct on the part of the judge in that, after the stipulation had been proposed, the judge said that the appellant had taken the witness stand and had said that he would take a lie detector test. With respect to the alleged misconduct, appellant argues to the effect that the proposal of the stipulation by the deputy and the remark of the judge placed counsel for appellant in a dilemma "of choosing to refuse the lie detector test, thereby creating an impression of appellant's guilt, or choosing to subject appellant to an unreliable mechanical device to determine his guilt or innocence." The details as to what was said, at the trial, regarding the polygraph tests have been stated hereinabove, and it is not necessary to repeat them here. As to the conduct of the deputy district attorney, it appears that his proposal of such stipulation was made pursuant to appellant's offer to take the test. As to the conduct of the judge, it is to be noted that his statement, as to what appellant said on the witness stand about taking the test, was made in response to a statement by counsel for appellant that he (counsel) did not remember anything in the evidence about a polygraph. It thus appears that the deputy's offer of the stipulation was invited by appellant, and that the judge's remark was invited by counsel for appellant. In any event, the result of the discussion about the polygraph tests was that counsel for appellant was permitted to withdraw his stipulation, the report of the tests was not filed, and the judge said that the report did not affect him at all and would not interfere with his opinion. There was no misconduct on the part of the deputy district attorney or the judge.

The judgment (order granting probation) and the order denying the motion for a new trial are affirmed.

Vallée, J., concurred.

SHINN, P. J.—I dissent.

Elementary principles of law as applied to facts that were conclusively established made it the duty of the trial court to acquit the defendant of attempted murder and all included offenses.

The guiding principle is that a judgment in a criminal case conclusively implies the existence of facts necessary to the rendition of the judgment and the nonexistence of facts that would have prevented its rendition. They cannot be relitigated between the parties. (*Sealfon* v. *United States*, 332 U.S. 575 [68 S.Ct. 237, 92 L.Ed. 180]; *Harris* v. *State*, 193 Ga. 109 [17 S.E.2d 573, 147 A.L.R. 980]; *United States* v. *DeAngelo* (3d Circuit), 138 F.2d 466; *Yawn* v. *United States*, (5th Circuit), 244 F.2d 235; *Vaughn* v. *State*, 83 Ga.App. 124 [62 S.E.2d 573]; *United States* v. *Simon* (3d Circuit), 225 F.2d 260.)

Defendant was charged with assault with intent to commit murder. The prosecutrix testified that he shoved her to the floor, sat upon her, held her nose closed to compel her to breathe through her mouth and forced her to swallow a potentially fatal quantity of nembutal tablets.

The elements of the offense were (a) forcing the prosecutrix to swallow the pills and (b) an intent to take her life. The judgment of acquittal of attempted murder conclusively implies either that defendant did not force the pills upon the prosecutrix or that he did so but had no intention of taking her life.

First as to the possibility that he committed the act but without criminal intent. It would be absurd to give that interpretation to the acquittal, and no one has suggested it. The judgment of conviction of assault by means of force likely to produce great bodily injury conclusively implies that the court found that defendant was not merely being playful, but that he intended to harm the prosecutrix. Whether right or wrong that was the court's finding. Therefore the inescapable inference is that defendant did not force the prosecutrix to swallow the pills; ergo, she swallowed them voluntarily.

The majority opinion gives no consideration to the im-

plications of the judgment of acquittal other than to say that it does not "necessarily" mean that the court did not believe that defendant did force the prosecutrix to swallow the pills. What, then, does the judgment mean to the majority? The answer is, nothing.

It is argued that when the court expressed doubt that defendant forced the pills upon the prosecutrix the court meant something else. But the court thereupon acquitted the defendant of attempted murder and what the court meant by what it said is shown beyond doubt by what it did.

If, as appears to be the case, the majority opinion means that the court found that defendant forced the prosecutrix to swallow the pills, it is clearly in error. It develops that theory from statements of the court, and in so doing violates the invariable rule that implications of a judgment cannot be impeached by remarks made by the court; in the second place if defendant forced the pills upon the prosecutrix the court would have been compelled to find him guilty of attempted murder; and in the third place the judgment conclusively implies that defendant did not force the prosecutrix to swallow the pills.

But, says the majority opinion, the court said that it believed, in any event, that defendant choked the prosecutrix in attempting to make her swallow the pills, and the opinion argues that choking could constitute assault by means of force likely to produce great bodily injury, which no one has questioned.

This "choking" theory defies explanation. It is purely imaginary. To begin with, there was not one shred of evidence of choking; again, the majority opinion asserts that the "choking" took place while defendant was sitting upon prosecutrix and forcing the pills upon her, and the evidence set out in the opinion clearly shows that there could have been no choking unless it was in forcing the prosecutrix to swallow the pills; and yet again, if there had been choking it would have been the duty of the court to convict defendant of attempted murder. There being no evidence of choking, the majority opinion simply takes a statement of the trial court and gives it controlling effect over the legal implications of the judgment.

In order to find a basis for affirmance of the judgment the majority opinion develops the theory that the defendant was found guilty of acts constituting attempted murder and yet was arbitrarily acquitted of that offense. It is true that in

the probation hearing the court stated that it believed that defendant choked the prosecutrix in attempting to force her to swallow the pills, but reliance by this court upon what the trial court said at one time or another in disregard of the implications of its judicial acts develops the unsound hypothesis that the defendant sat upon the prosecutrix, choked her, fed her pills, but did not force her to swallow them. It appears that the statements relied upon overlooked the fact that she did swallow the pills.

The theory that what the court said overcomes the legal consequences of its judgment is logically and legally untenable. The trial court could not have been guilty of such a breach of judicial duty as to find facts establishing defendant's guilt and then acquit him. This court should pay no attention whatever to the remarks of the trial court and consider only what the court did.

The judgment of acquittal of attempted murder conclusively implies that defendant did not force the prosecutrix to swallow the pills or choke her in the attempt; and there was no evidence whatever of the use of force in any other manner.

The trial court could not go behind the facts that were established by its own judgment. It could not compromise with those facts and find defendant guilty of a lesser offense upon the supposed existence of facts it had adjudged to be nonexistent. But this is what it attempted to do.

It gives me real concern to see a judgment affirmed upon the basis of random remarks of a trial court while the contrary implications of the court's judicial acts are disregarded. The rule that the implications and consequences of a judgment cannot be impeached in this manner is, as I say, invariable. To depart from it is to invite endless confusion and error.

When the court acquitted the defendant of attempted murder it determined (and I must say with good reason) that the prosecutrix swallowed the pills voluntarily. That put an end to the prosecution. The ex gratia conviction of the lesser offense came after the court had divested itself of jurisdiction to act except by rendering a judgment of acquittal.

I would reverse the judgment with instructions to dismiss the cause.