[Crim. No. 11372. Second Dist., Div. Three. Sept. 2, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. ANTHONY GRAY MUIR, Defendant and Appellant.

Richard T. Griffin, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Rose-Marie Gruenwald, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, J.—A jury convicted defendant of assault by means of force likely to produce great bodily injury. (Pen. Code, § 245.)

On appeal the judgment is mainly attacked on the basis that the evidence was insufficient to support the verdict. The facts are confusing and the evidence that it was defendant who committed a brutal attack on the victim, Mrs. Anderson, is admittedly circumstantial, but after a thorough review of the record we cannot say that the jury unreasonably rejected ''all that undermines confidence'' in the prosecution's case. (*People* v. *Hall*, 62 Cal.2d 104, 112 [41 Cal.Rptr. 284, 396 P.2d 700].)

The facts of the case are well known to the parties and need not be repeated at length: having received the bad news of his divorce on the day the crime was committed, defendant proceeded to get drunk to the point where he claimed he lost consciousness. It is not contended, however, that the evidence below was such that the jury was bound to believe this claim. The victim, Mrs. Anderson, was struck by someone while she was having an after hours cup of coffee in the restaurant where she worked. This was at about 11 p.m. She could not tell whether she was hit by an object or a hand. She lost consciousness. She next remembered getting up and going to a telephone to call for help. At that time she was pitifully wounded. Then there is another gap in her memory; the next thing she recalled was walking across an alley to a cafeteria next door. Physical evidence, such as his sailor's cap and a palm print put defendant on the restaurant premises. These were found in the area which at the trial was designated as Corridor A. Other physical evidence, consisting in part of blood stains,

indicates that the assault took place in the area called Corridor C, near its intersection with Corridor B.[1]

There is uncontradicted evidence that a short time after somebody assaulted Mrs. Anderson in the restaurant, defendant broke the window of a nearby hot dog stand, attempted to assault a woman in a car and did actually assault a bookbinder who was working late in his shop. He was on a rampage.

The argument concerning the alleged lack of evidence that it was defendant who committed the assault centers on the confusion in the record concerning the accessibility of Corridor C from Corridor A. The most direct access from one corridor to the other was through a door designated as Door 2. This was a vertical sliding door, which could be bolted from the inside, that is to say from Corridor C. More complicated access was provided by way of Door 3 which was similarly constructed. In addition it appears to have been physically possible at all times to get from Corridor A to Corridor C through Door 4, then through another door connecting a large dining room with the one where Mrs. Anderson sat when first struck and further through a door leading from that dining room into Corridor D which intersects with Corridor C.

Defendant's counsel claims, in effect, that the testimony compels a finding that defendant never was in Corridor C, where the assault took place, because Door 2 was found "closed and locked from the inside" after the assault. With all due respect to counsel, who has displayed an unusual dedication to his client and whose briefs are otherwise models of accuracy and fairness, we find no evidence that Door 2 was "locked" in the sense that a key was necessary to open it. While it is true that the witness Egan said the door was "locked," his next answer shows that he meant to say that it was merely bolted. There is indeed very strong evidence that the door was down and bolted sometime after Mrs. Anderson left the building and we agree that it is very improbable that she closed it, the operation being somewhat complicated. Certainly she could not have bolted it from the inside without thereafter having to get to the alley by a more circuitous route. However, there is adequate circumstantial evidence to permit a finding that before she left, Door 2 was open. With-

---

[1]The areas which the parties called Corridor B, C and D are, in truth, nothing of the kind but merely certain areas in the kitchen portion of the restaurant where one could walk in a straight line. Corridor A is a true corridor running along the alley in the back of the restaurant and separated from the kitchen area by the doors designated as Doors 2, 3 and 4 respectively. Door 1 leads from Corridor A into the alley.

out attempting a full listing of all possible inferences from the record, we merely point to the following:

1. Mrs. Anderson testified that after Mr. and Mrs. Jones left at 10 p.m. she was alone in the restaurant as far as she knew. At that time Door 2 was open.[2] To be sure, if the witnesses Egan and Baker are correct, somebody closed that door before they arrived at the scene, but this is not irreconcilable with the door being open at an earlier time, even though the prosecution was unable to produce evidence of the identity of the person who closed it.

2. It seems highly probable that Mrs. Anderson, after completing her telephone call, took the route through Corridors D and C and Doors 2 and 1 into the alley. Any other route would have taken her through Corridor A. She was apparently bleeding profusely and no blood was found in Corridor A. Furthermore, Corridor A was physically blocked by a large laundry bag and other objects on the floor over which she would have had to step.

3. Although defendant's counsel understandably raises an eyebrow with respect to a police officer's testimony to the effect that Door 2 was open when he arrived at the scene shortly after the crime—he had testified to the contrary at the first trial—the jury was entitled to believe him.

There were, of course, certain gaps in the case, but none of them were of such a nature that they cannot be bridged by inferences which the evidence fairly justified. The evidence sustains the conviction.

The next assignment of error concerns alleged misconduct of the prosecutor in suggesting in his argument that defendant committed perjury when he testified that after he regained his senses he noticed certain wounds on his hands and head which would have provided an innocent explanation for blood on his clothing. The prosecutor also suggested that in order to disbelieve a police officer who had given contrary testimony, the jury would have to find him "a perjurer and liar." No objection was made.

We see no misconduct. The argument was fairly based on the evidence. The officer had indeed given very positive testimony concerning the lack of injuries on defendant after his

---

[2] It is unfortunate that counsel did not use the numerical designations for the doors during Mrs. Anderson's testimony. We feel quite certain, however, that the door to which Mrs. Anderson refers on page 58 of the reporter's transcript as being open, is the one which was later called Door 2.

arrest, coupled with detailed testimony concerning a reddened and inflamed area "much like a burn" on the tip of defendant's left ear. The suggestion to the jury that the officer's failure to recall seeing injuries which could account for the blood could not be the result of innocent forgetfulness, was justified. Finally, it was not improper to submit, in effect, that defendant's testimony about there having been injuries, could not be an innocent mistake.

It should be remembered that the prosecution had a vital interest in urging that defendant's story about a total lack of consciousness was deliberately false. Direct proof of his state of mind at the time of the assault on Mrs. Anderson was, in the nature of things, impossible. His own testimony to a lack of consciousness was positive and not substantially shaken by impeachment. The prosecutor undoubtedly anticipated that the jury would be instructed—as it was—that the defendant's intoxication "may have a bearing on the question . . . whether or not he attempted to commit a violent injury upon the person of another. . . ." (CALJIC No. 607-A.) We know of no rule which forbids the prosecutor to argue to the jury that a defendant, who has elected to testify in his own behalf, has withheld true facts or deliberately lied; nor do we know of a rule which forbids him from arguing that if the jury is going to disbelieve a prosecution witness, it would have to find that he has deliberately lied. As long as the argument is based on the evidence and not intemperately made, there is no misconduct.

▉ This being so it is unnecessary to discuss at length the "awkward" position of defense counsel, who had at one time offered to testify that he too noticed cuts on defendant's hands when he interviewed him the day after the arrest. This offer was made "off-the-record" and we only glean what happened from the court's discussion at the time of the motion for a new trial. Apparently the court told defense counsel that he could testify, but that he would be precluded from arguing his own credibility to the jury. It is not clear whether this prohibition was expressed as a legal ruling or as an observation concerning the ethical problems inherent in such a situation. In any event counsel elected not to testify. It is urged on us that this somehow aggravated the claimed misconduct. We disagree. Nor do we follow the argument how this off-the-record discussion prevented defense counsel from assigning the prosecutor's remarks as misconduct.

Finally error is claimed in the failure to give a requested

instruction, copied in the footnote,[3] which is a paraphrase of language used in *People* v. *Fuentes*, 74 Cal.App.2d 737, 741 [169 P.2d 391].

On the first appeal of this case before Division Four of this court, it was held that error had been committed at the first trial when the court failed to instruct the jury on simple assault. (*People* v. *Muir*, nonpublished opinion, District Court of Appeal, Second District, Crim. No. 9747, December 8, 1964.) On that appeal it had been the theory of defendant that the evidence justified a finding that he merely administered the blow which rendered Mrs. Anderson unconscious in the dining room and that she received her other injuries at the hand of someone else or accidentally. The court held that an instruction on simple assault should have been given, citing *People* v. *Fuentes*, 74 Cal.App.2d 737 [169 P.2d 391].[4] This mandate was fully obeyed at the second trial.

Our great respect for the court which filed the opinion in *People* v. *Fuentes* and particularly for its author, makes us very reluctant to say so, but we think *People* v. *Fuentes* is and always was out of tune with the law on the crime of assault "by any means of force likely to produce great bodily injury."[5] More particularly, we think that the apparent holding of the case, that a blow to the jaw sufficient to knock out the recipient cannot prove such an assault, is wrong.

When *People* v. *Fuentes* was written it was settled: 1. that the offense in question could be perpetrated by means of the hand alone (*People* v. *Tallman*, 27 Cal.2d 209, 212 [163 P.2d 857] and cases cited therein) and 2. that guilt did not depend on the extent of the injuries suffered by the victim, but on a determination that the force applied was likely to cause great bodily injury (*People* v. *Day*, 199 Cal. 78, 85 [248 P. 250]; *People* v. *Schmidt*, 66 Cal.App.2d 253, 256 [152 P.2d 1021]), although the extent of the injuries suffered is often indicative of the amount of force used. (*People* v. *Orona*, 72 Cal.App.2d

[3] "A blow sufficient to knock out the recipient is not unusual in fistic encounters and such a result from one blow is not ordinarily considered a great bodily injury, for it is usual for the victim to recover consciousness and the use of his faculties within a short time."

[4] Actually the court in *People* v. *Fuentes* reduced the offense to battery. (Pen. Code, § 242.) This has already been judicially recognized as error, since battery is not an offense included in the crime under discussion. (*People* v. *Mueller*, 147 Cal.App.2d 233, 239 [305 P.2d 178], fn. 1; *People* v. *McCaffrey*, 118 Cal.App.2d 611, 619 [258 P.2d 557].)

[5] According to Shepard's citator the case has been distinguished six times and explained once. It has never been followed.

478, 486 [164 P.2d 769] ; see also *People* v. *Hahn,* 147 Cal.App. 2d 308, 311 [305 P.2d 192] ; *People* v. *Pullins,* 95 Cal.App.2d 902, 904 [214 P.2d 436].)

In *People* v. *Fuentes* the defendant struck the victim on the side of the head knocking him out. The victim fell and his head struck a rail which caused a wound. The court apparently felt that the result of the blow was the sole criterion by which the amount of force could be judged.[6] Applying this test it held that neither the loss of consciousness nor the wound caused by the fall were serious injuries.

This, we believe, was a misconception. The statute prohibits an assault by means of force *likely* to produce great bodily injury, not the use of force which does *in fact* produce such injury. While, as noted, the results of an assault are often highly probative of the amount of force used, they cannot be conclusive. If the victim in *People* v. *Fuentes,* in falling, had struck a sharp rock with his eye, his injury would have been far more serious, yet the amount of force which produced it not one erg different.

The cases indicate that the question of whether or not the force used was such as to have been likely to produce great bodily injury, is one of fact for the determination of the jury based on all the evidence, including but not limited to the injury inflicted. (*People* v. *Wilson,* 218 Cal.App.2d 564, 566 [32 Cal.Rptr. 406] ; *People* v. *Barton,* 172 Cal.App.2d 474, 486 [341 P.2d 709] ; *People* v. *Yancy,* 171 Cal.App.2d 371, 374 [340 P.2d 328].) A rule which declares as a matter of law that the force behind a blow to the head which causes unconsciousness cannot serve as the basis for a possible[7] felony conviction, may have had some value in the more robust past, when society was perhaps more tolerant of those who expressed their hostilities and frustrations in fist fights, but it is plainly contradicted by everyday experience and is, we think, bad law.

The judgment is affirmed.

Shinn, P. J., and Ford, J., concurred.

---

[6]"Under facts of this case *the measure of the likelihood of great bodily injury is the result produced* by the blow and fall, for the likelihood of great bodily injury from the blow is demonstrated by the injury actually inflicted." (*Ibid.,* p. 741; italics added.)

[7]The crimes proscribed by section 245 of the Penal Code may be punished either as misdemeanors or as felonies.