[Crim. No. 10346. In Bank. Dec. 23, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. PHILLIP DEAN ELLIS, Defendant and Appellant.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

530

532

James R. Tormey, Jr., under appointment by the Supreme Court, and Michael R. Nave for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edward P. O'Brien, John F. Kraetzer and John Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

TRAYNOR, C. J.—Defendant appeals from a judgment of conviction entered upon a verdict finding him guilty of assault with intent to commit rape (Pen. Code, § 220).

The victim testified that while she was waiting for a bus in Burlingame at 5 a.m., July 20, 1964, defendant sought to induce her to engage in sexual intercourse. When she rebuffed him, he threatened to use his knife to compel submission. She saw no knife, but fled screaming, and defendant ran beside her repeatedly whispering, ''Walk. Don't run.'' When a newspaper boy appeared on the otherwise deserted street defendant disappeared.

Defendant was arrested on September 9, 1964, and taken to the San Mateo Police Department, where the victim identified him in a lineup as her assailant. The victim also indicated that she could identify her assailant's voice. She was placed in a

room next to the interrogation room, and defendant was asked to repeat phrases recited by the police. Defendant refused to cooperate and remained silent.

Police officers testified that they advised defendant of his right to counsel and of his right to remain silent and testified to his responses to their questions. They also testified that he refused to participate in the voice identification test. Defendant contends that introduction of the evidence of his refusal to participate in a voice identification test and the prosecutor's comments thereon violated his constitutional privilege against self-incrimination.

■ The privilege against self-incrimination applies to evidence of "communications or testimony" of the accused, but not to "real or physical" evidence derived from him. (E.g., *Schmerber* v. *California* (1966) 384 U.S. 757, 764 [16 L.Ed.2d 908, 86 S.Ct. 1826]; *Holt* v. *United States* (1910) 218 U.S. 245, 252-253 [54 L.Ed. 1021, 31 S.Ct. 2]; *Gilbert* v. *United States* (9th Cir. 1966) 366 F.2d 923; *United States* v. *Denno* (2d Cir. 1966) 355 F.2d 731, 738; *Rigney* v. *Hendrick* (3d Cir. 1965) 355 F.2d 710, 713-714; *Kennedy* v. *United States* (D.C. Cir. 1965) 353 F.2d 462, 466; *Caldwell* v. *United States* (8th Cir. 1964) 338 F.2d 385, 389; *People* v. *Lopez* (1963) 60 Cal.2d 223, 243-244 [32 Cal.Rptr. 424, 384 P.2d 16]; *People* v. *Duroncelay* (1957) 48 Cal.2d 766, 770 [312 P.2d 690]; *People* v. *Trujillo* (1948) 32 Cal.2d 105, 112-113 [194 P.2d 681]; *People* v. *Zavala* (1966) 239 Cal.App.2d 732, 738-739 [49 Cal.Rptr. 129]; 8 Wigmore, Evidence (McNaughton rev. 1961) § 2265, p. 386; Model Code of Evidence (1942) rule 201 (2); Uniform Rules of Evidence (1953) rule 23 (3).) The results of voice identification tests fall within the category of real or physical evidence. (*Gilbert* v. *United States, supra; Rigney* v. *Hendrick, supra; People* v. *Lopez, supra;*[1] Wigmore, *op. cit., supra*; cf. *People* v. *Graves* (1966) 64 Cal.2d 208 [49 Cal.Rptr. 386, 411 P.2d 114], cert. den., 385 U.S. 883 [17 L.Ed.2d 111, 87 S.Ct. 175].) ■ In such a test, the speaker is asked, not to communicate ideas or knowledge of facts, but to engage in the physiological processes necessary to produce a series of articulated sounds, the verbal meanings of which are

---

[1]Other state authority is collected at 16 A.L.R.2d 1322-1328; 2 A.L.R.2d Later Case Service. See also *State* v. *Freeman* (1965) 195 Kan. 561 [408 P.2d 612]; *State* v. *King* (1965) 44 N.J. 346 [209 A.2d 110]; *Boyer* v. *State* (Fla. App. 1966) 182 So.2d 19. For an analysis of the limited state authority that excludes voice identification see Recent Cases (1949) 24 Ind.L.J. 587.

unimportant. The sounds alone are elicited for identification purposes through characteristics such as pitch, tone, intonation, accent, and word stress. ■ The speech patterns of individuals are distinctive[2] physical characteristics that serve to identify them just as do other physical characteristics such as color of eyes, hair, and skin, physical build and fingerprints.

Voice identification testimony is the product of an observable physical characteristic made by an independent witness. It is the very type of objective factual evidence, independent of information communicated by the accused, that the privilege encourages police to seek.[3] Moreover, independent identification testimony, unlike testimonial evidence derived from the accused, raises no question of reliance on the veracity of the accused.[4] Any attempt by a suspect to disguise his voice is apt to be detected readily by those persons present who can compare the sample with his normal voice. Furthermore, there is no risk that one could be coerced into falsely accusing himself. It is difficult to imagine how a suspect could be induced to impersonate an unknown voice to incriminate himself.

■ It has been urged that the privilege reflects an ultimate sense of fairness that prohibits the state from demanding assistance of any kind from an individual in penal proceedings taken against him.[5] The privilege includes no such prohibi-

[2]Even the untutored ear usually can distinguish a male voice from a female voice, a foreign accent from a local accent, a lisp from conventional speech, or identify a peculiar way of pronouncing certain words. It has been reported that voices can be electronically compared by ''voiceprints'' and identified with much the same reliability as fingerprints. (Newsweek, April 25, 1966; 89 Science News 293 (1966).)

[3]*Escobedo v. Illinois* (1964) 378 U.S. 478, 488-489 [12 L.Ed.2d 977, 94 S.Ct. 1758]; *People* v. *Graves, supra,* 64 Cal.2d 208, 211; 8 Wigmore, Evidence (McNaughton rev. 1961) § 2251.

[4]The argument has been advanced that the mere act of speaking produces an implied testimonial element: an implied statement by the accused that ''this is my voice.'' (Weintraub, *Voice Identification, Writing Exemplars and the Privilege Against Self-Incrimination* (1957) 10 Vand.L.Rev. 485, 505.) This contention is logically correct, but it could easily include any situation where the subject is required to cooperate in making possible inspection of physical characteristics (i.e., stance, walk, facial features, writing, fingerprints, blood tests). The key issue, however, is the degree of reliance on the veracity of the accused. (*Ibid.*) The difficulty of deceit and the practical impossibility of a knowing attempt at a false self-incrimination, through a voice impersonation of a guilty party, lead us to reject this factor as not being significant in voice identification. (See Comment (1948) 1 Vand.L.Rev. 248, 250.)

[5]See 8 Wigmore, Evidence (McNaughton rev. 1961) § 2251, pp. 317-318.

tion. Criminal proceedings are replete with instances where at least passive cooperation of an accused may be constitutionally required.[6]

A suspect asked to speak for voice identification is not subjected to the same psychological pressures said to be generated by a demand for testimony.[7] ■ It is no more unfair to ask a suspect to speak for voice identification than to ask him to appear in a lineup for visual identification. The psychological pressures are reduced to the same degree, through a limitation of alternatives. Deceit is improbable; the simple choice for a guilty person is between conduct likely to expose incriminating evidence and inferences as to guilt likely to flow from a successful refusal to participate.

A related view of the individual interest protected by the privilege focuses on the right of privacy. (*United States* v. *Grunewald* (2d Cir. 1956) 233 F.2d 556, 581-582 (Frank, J., dissenting) revd. 353 U.S. 391 [1 L.Ed.2d 931, 77 S.Ct. 963, 62 A.L.R.2d 1344]; Ratner, *Consequences of Exercising the Privilege Against Self-Incrimination* (1957) 24 U.Chi.L.Rev. 472, 488-489.) The Fifth Amendment right of privacy protects at least uncommunicated thoughts and has been extended to preclude compelled production of private papers and documents. (*Boyd* v. *United States* (1886) 116 U.S. 616 [29 L.Ed. 746, 6 S.Ct. 524].) ■ A voice test, however, contemplates no such intrusion into privacy; no disclosure of thought or privately held information is requested. One's voice is hardly of a private nature. It is constantly exposed to public observation and is merely another identifying physical characteristic.

---

[6]Examples are set forth at 8 Wigmore, Evidence (McNaughton rev. 1961) § 2265, pp. 387-397. They include fingerprinting, photographing, or measuring of the subject, taking imprints of portions of a suspect's body, removal of or placing articles of clothing on the subject, and requiring the accused's presence at the trial itself.

A controlling distinction sometimes made between active and passive cooperation is, in terms of the reasons for the existence of the privilege, more apparent than real. ''This is a distinction which is aesthetically attractive but which seems to have no basis in history, practicality or justice.'' (McCormick, Evidence (1954) § 126, p. 265.) Passive cooperation is affirmative cooperation; at least passiveness of the subject is required to take a fingerprint or a photograph. The subject can resist having a fingerprint or photograph taken. There is no greater likelihood that coercion would be employed or that a suspect would be disturbed physically or psychologically in those cases where ''active'' cooperation is requested than where ''passive'' cooperation is necessary.

[7]A demand for a statement is said to produce a ''cruel trilemma.'' (*Murphy* v. *Waterfront Com.* (1964) 378 U.S. 52 [12 L.Ed.2d 678, 84 S.Ct. 1594]; 8 Wigmore, Evidence (McNaughton rev. 1961) § 2251, pp. 316-317.)

It thus appears that an extension of the privilege to voice identification would serve none of the purposes of the privilege. It would only exclude evidence of considerable importance when visual identification is doubtful or impossible. The masked robber, the telephone extortionist, and the attacker in the night may all seek refuge behind an extension of the privilege that would do little to further the welfare of accused persons in general. Denial of access to a pertinent identifying trait can only weaken a system dedicated to the ascertainment of truth.

We do not leave the individual unprotected. The need for protection is greater in confession cases where the risk of police overzealousness is comparatively great because self-incriminating statements are the most persuasive evidence of guilt. Testimony by a witness resulting from a purported identification is less conclusive and there is therefore less incentive for police to use unwarranted pressure in obtaining the evidence. Nevertheless, it bears emphasis that, as in the case of all police procedures for the securing of nonprivileged evidence, fundamental principles of fairness and due process are always applicable to prevent abuse. (See *Rochin* v. *California* (1952) 342 U.S. 165 [96 L.Ed. 183, 72 S.Ct. 205, 25 A.L.R.2d 1396] ; *People* v. *Matteson* (1964) 61 Cal.2d 466 [39 Cal.Rptr. 1, 393 P.2d 161].)

Even though evidence obtained from a voice identification is not within the privilege against self-incrimination, the question remains whether evidence and comment on a refusal to take such a test is admissible. ▆▆ It is clear that ''it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation.'' (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 468, fn. 37 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) This doctrine is a logical extension (*People* v. *Cockrell* (1965) 63 Cal.2d 659 [47 Cal.Rptr. 788, 408 P.2d 116]) of the rule of *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], prohibiting comment on the failure of an accused to testify at trial. Comment on refusal to testify was held to be ''a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly.'' (*Griffin* v. *California, supra,* at p. 614.) ▆▆ Such a rule is not applicable when, as in this case, the defendant has no constitutional right to refuse to speak solely for purposes of voice identification.

▆▆ Nor was defendant's refusal to ''display his voice''

itself a testimonial communication. It was circumstantial evidence of consciousness of guilt, and like similar evidence, such as escape from custody (*People* v. *Otis* (1959) 174 Cal.App.2d 119 [344 P.2d 342]), false alibi (*People* v. *Allison* (1966) 245 Cal.App.2d 568, 576 [54 Cal.Rptr. 148]), flight (*People* v. *Hoyt* (1942) 20 Cal.2d 306 [125 P.2d 29]), suppression of evidence (*People* v. *Burton* (1961) 55 Cal.2d 328 [11 Cal. Rptr. 65, 359 P.2d 433]), and failure to respond to accusatory statements when not in police custody (see 19 Cal.Jur.2d, Evidence, § 401, p. 141 et seq.), its admission does not violate the privilege. Moreover, as in the foregoing examples, the evidence did not result from a situation contrived to produce conduct indicative of guilt. Unlike the superstitious tests described by Wigmore[8] and their modern successor, the lie detector,[9] that have as their sole purpose the establishment of an environment in which the accused's consciousness of guilt can be detected, the purpose of asking defendant to speak was to obtain probative physical evidence and the conduct was merely incident to that effort. ■ [See fn. 10] A guilty party may prefer not to find himself in a situation where consciousness of guilt may be inferred from his conduct, but it can scarcely be contended that the police, who seek evidence from the test itself, will tend to coerce parties into refusing to take tests in order to produce this evidence.[10]

■ Although conduct indicating consciousness of guilt is often described as an "admission by conduct,"[11] such nomenclature should not obscure the fact that guilty conduct is not a testimonial statement of guilt. It is therefore not protected by the Fifth Amendment. By acting like a guilty person, a man does not testify to his guilt but merely exposes

---

[8] " 'In the olden time it was a popular superstition that the corpse of the slain would bleed afresh if touched by the murderer; and it was deemed almost conclusive of guilt that he who was charged with the murder refused to lay his finger on the body or to take his hand; . . .' " (2 Wigmore, Evidence (3d ed. 1940) § 275.)

[9] The lie detector operates on a principle of observable physiological deviations from the norm when an accused attempts to avoid verbal responses which he thinks will indicate guilt. It is designed to probe the conscious knowledge of the accused and in that respect sought-after responses may be viewed as essentially testimonial. (See *Schmerber* v. *California, supra,* 384 U.S. 757, 764.)

[10] Protection from possible police abuse in obtaining evidence is of course one of the primary reasons for the existence of the Fifth Amendment privilege, but the protection is unnecessary when police efforts in conducting voice tests will tend to prevent, not induce, the production of evidence of a refusal to cooperate.

[11] See, e.g., McCormick, Evidence, §§ 247-250.

himself to the drawing of inferences from circumstantial evidence of his state of mind.[12]

We are aware that the United States Supreme Court in *Schmerber* v. *California* (1966) 384 U.S. 757, 765, fn. 9 [16 L.Ed.2d 908, 86 S.Ct. 1826], has cautioned that in some cases the administration of tests might result in "testimonial products" proscribed by the privilege. We do not believe, however, that the inferences flowing from guilty conduct are such testimonial products. Rather, the court's concern seemed directed to insuring full protection of the testimonial privilege from even unintended coercive pressures. In the case of a blood test, for example, the court considered the possibility that fear induced by the prospect of having the test administered might itself provide a coercive device to elicit incriminating statements.[13] Such a compelled testimonial product would of course be inadmissible.

Evidence of the refusal is not only probative; its admission operates to induce suspects to cooperate with law enforcement officials. Only the overriding interest in protecting the privilege against compulsory self-incrimination, itself the result of a delicate balance, prohibits evidence or comment in the refusal to testify cases. But the privilege itself is not at issue here. Without exception, none of the reasons that support the privilege lends support to a rule that would exclude probative evidence obtained from an accused's effort to conceal nonprivileged evidence.

In the present case, however, the police officers

[12]Wigmore was careful to distinguish conduct as evidence of belief from admissions. He not only makes the general point that the term "implied admissions" is somewhat misleading, even when applied to witnesses in a civil case (2 Wigmore, Evidence (3d ed. 1940) § 267, p. 95), but he stresses that in criminal cases guilty conduct on the part of an accused is evidence in which the "circumstantial nature of the inference strongly dominates the testimonial aspect. . . ." (2 Wigmore, *op. cit.*, *supra*, at p. 94.)

The inferential chain here is no different from that which makes any event that does not directly illuminate the circumstances of the crime charged a relevant fact. The trier of fact must reason from, for example, an escape from jail, to a consciousness of guilt that would motivate the escapee's conduct, and, from that premise, to the conclusion that such conduct is relevant to the ultimate issue of guilt or innocence. The key factor is that no testimony of an accused, or other equivalent intended to communicate knowledge, such as a writing, sign language, or a demonstration, forms the basis for the inferential chain.

[13]"Indeed, there may be circumstances in which the pain, danger, or severity of an operation would almost inevitably cause a person to prefer confession to undergoing the search, and nothing we say today should be taken as establishing the permissibility of compulsion in that case." (*Schmerber* v. *California, supra,* 384 U.S. 757, 765, fn. 9.)

warned defendant that he had the right to remain silent and that anything he said could be used against him. This warning did not distinguish between speech in terms of communications and speech for voice identification, between a refusal to speak free from sanctions and a refusal to speak productive of detrimental inferences. That distinction would hardly occur to a layman unless it was called to his attention. Thus, defendant's refusal to speak might well have been the direct result of the police warning and cannot be used against him. (Cf. *Johnson* v. *United States* (1943) 318 U.S. 189 [87 L.Ed. 704, 63 S.Ct. 549]; *People* v. *Gilbert* (1944) 25 Cal.2d 422, 443 [154 P.2d 657].)

■ The usual Fifth Amendment warning that a suspect has a right to remain silent creates this problem, for if taken literally it includes the right not to speak at all.[14] After having given such a warning, if the police direct a defendant to speak for voice identification and he refuses, they must, as a prerequisite to the use of the defendant's refusal to speak as evidence of consciousness of guilt, advise him that the right to remain silent does not include the right to refuse to participate in such a test.

Defendant also assigns as error the prosecutor's repeated references to him and his alibi witness as perjurers. ■ Interpretive, but fair, comment on evidence submitted to the jury is proper. The prosecutor should point out the conflicts and inconsistencies in the evidence and those evidentiary matters that render the prosecution testimony more believable than that submitted by the defense.

Prosecutors tread on dangerous ground, however, when they resort to epithets to drive home the falsity of defense evidence. (See *People* v. *Love* (1961) 56 Cal.2d 720, 731 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809].) ■ The term liar,[15] for instance, implies more than offering untrue testimony; it implies a wilful falsehood. (Webster's New Internat.

---

[14]Even if the warning is understood in this literal sense, however, it is not misleading if the evidence sought is not speech for voice identification but evidence of other physical characteristics such as photographs, fingerprints, or blood samples.

[15]The appellate court has characterized use of the term liar as ''harsh,'' but ''in the realm of fair comment.'' (*People* v. *Mora* (1956) 139 Cal.App.2d 266, 272-273 [293 P.2d 522].) In that case conflicting stories of witnesses were before the jury and no objection to the use of the term was made at the trial. (Cf. *People* v. *Baker* (1960) 183 Cal. App.2d 615, 624-625 [7 Cal.Rptr. 22].)

540

Dict. (2d ed. 1939).) The term perjurer has, as its only formal semantic distinction *vis-à-vis* liar, the additional element of the oath. (Webster's New Internat. Dict. (2d ed. 1939); see Pen. Code, § 118.) A charge of perjury, however, produces more than moral opprobrium. Perjury is a felony, and the connotation conveyed to the jury is therefore apt to be far more derogatory than that conveyed by the term liar. Particularly when applied to the defendant, it is apt adversely and unnecessarily to affect the ability of the jury dispassionately to weigh the credibility of the accused and the issue of guilt or innocence. ■ Unless the prosecutor is careful to state that his conclusion that perjury was committed is predicated solely on the evidence before the jury, the spectre of jury reliance on prosecutorial access to information outside the record is raised. (See *People* v. *Perez* (1962) 58 Cal.2d 229, 246 [23 Cal.Rptr. 569, 373 P.2d 617].)

■ In attacking the credibility of defense witnesses, a single reference to a witness as having perjured himself, based on an analysis of the evidence before the jury, may be unobjectionable. (Cf. *People* v. *Muir* (1966) 244 Cal.App.2d 598, 601-602 [53 Cal.Rptr. 398].) When, however, as in this case, the prosecutor makes repeated references to defendant and his wife as perjurers,[16] notwithstanding objection, and further makes a suggestion that the issue of perjury bears

---

[16]Prosecutor: "I had to bring them all back, every single instance where he was pinned down, it turned out he was talking a lie, l-i-e, lie, and that went throughout this entire trial. This trial has been loaded with perjury and lies, not one single witness for the People was shaken on cross-examination."
Defense Counsel: "Your Honor, I am going to object to that allegation as to perjury. . . ."
Prosecutor: "I didn't say 'perjury.' I said lies."
Defense Counsel: "He said perjury."
The Court: "Your statement was that your case was loaded down with perjury, counsel."
Prosecutor: "Oh, well, with lies. And it was, wasn't it? Did you ever hear such a mob as testified in this case for the defense?" (Rep. Tr., vol. 3, pp. 27, 28.)
Prosecutor: "[B]ecause of her [defendant's wife] affection for this defendant, for the want of stronger terms, she got on the stand and she actually perjured herself. She swore on an oath before God, so help me God, I will tell the truth. . . ." (Rep. Tr., vol. 3, p. 31.)
Prosecutor: "He has the receipt from Sacramento dated September 5th, that was the very foundation of two crimes of perjury right here in this courtroom. Him and his wife." (Rep. Tr., vol. 3, p. 32.)
Prosecutor: "[H]e [defendant] put his poor wife on the stand and made a perjurer out of her. . . ." (Rep. Tr., vol. 3, p. 34.)
Prosecutor: "[I]f you accept the word of an acknowledged perjurer and the word of an acknowledged perjurer's wife. . . ." (Rep. Tr., vol. 3, p. 61.)

directly on the issue of guilt,[17] his argument constitutes misconduct. (Cf. *People* v. *Conover* (1966) 243 Cal.App.2d 38 [52 Cal.Rptr. 172]; *People* v. *Reese* (1963) 220 Cal.App. 2d 143 [33 Cal.Rptr. 561].)

■ The question remains whether the errors were prejudicial. The evidence presents clearly conflicting stories regarding the crime charged. The victim's identification of defendant was supported by the newsboy, who was unable to identify defendant, but who testified that defendant's car was "similar to the one" he had seen the assailant drive. Defendant and his wife testified that they remained at a bowling alley in Richmond until 4:30 on the morning of the assault, at which time they drove back to Redwood City by way of San Jose. Two independent witnesses, the bowling alley proprietor and his wife, testified to the presence of defendant and his wife at the bowling alley and to their departure at an hour that would have precluded the possibility of defendant's presence at the scene of the crime.

Defendant was identified by three women who testified to five incidents ranging from indecent exposure to use of obscene language in a solicitation to sexual intercourse. None of these incidents involved violence. The first woman's identification was based on a single midnight encounter that had occurred two years earlier. Defendant denied the incident. The second woman testified to being followed in the early morning hours by a man in a car who ran towards her when she parked her car and began walking toward her house. Defendant testified that he was lost that night, was merely attempting to orient himself, and had no evil intent.

The third woman identified defendant and testified to three incidents that occurred after the crime charged and were spaced about two weeks apart. Defendant denied two of the incidents. As to the third incident, which occurred on September 6, 1964, defendant offered an alibi. He testified that both he and his wife were in Sacramento at a bowling tournament on that morning. Defendant's wife and his mother corroborated this alibi. Two disinterested rebuttal witnesses, however, testified that they accompanied defendant to Sacramento and participated in the bowling tournament, that defendant's wife did not make the trip, and that defendant drove back from Sacramento in time to leave the witnesses at a point near the scene of the incident more than an hour before it occurred.

---

[17] "[Y]ou can do nothing else but find a perjurer guilty of the charge." (Rep. Tr., vol. 3, p. 35.)

The jury was presented with directly conflicting evidence supported by independent witnesses on both sides. The evidence of consciousness of guilt improperly interjected a factor particularly damaging in a case where the defense is an alibi. The improper argument made the crucial task of objectively weighing the conflicting evidence susceptible to a subjective rejection of the defense evidence. We find, therefore, that it is reasonably probable that a result more favorable to defendant would have been reached absent the errors. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

The judgment is reversed.

Peters, J., Tobriner, J., Burke, J., and Peek, J.,* concurred.

MOSK, J.—I dissent.

The majority opinion easily persuades me that ''voice identification is not within the privilege against self-incrimination,'' and that the rule of *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], is inapplicable when the defendant has no constitutional right to refuse to speak solely for purposes of voice identification.

Our problem ends with the foregoing determination. The adoption of yet another rule for police procedure adds a superfluous burden to what the majority has appropriately called ''a system dedicated to ascertainment of truth.''

A defendant warned that he has a right to remain silent understands he cannot be compelled to give a statement relating to the offense he is suspected of committing. But certainly he cannot reasonably infer from the mandatory admonition that he may remain mute thereafter for all purposes. He is required to respond when asked his name, address, place of employment, next of kin, name of his attorney, and other relevant biographical information. When he goes to court, he may be asked similar questions, and generally he is expected to personally announce his plea (Pen. Code, § 1018). Queries of that type and the vocal response are designed not to effectuate self-incrimination but to achieve an orderly administration of justice.

Of a more substantive nature are other permissible efforts of the state to obtain the facts necessary for ascertainment of the truth, through fingerprinting, photographing, measuring the suspect; imprinting a portion of the suspect's body; physical

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

examination of the body; removal of or placing articles of clothing on the suspect; requiring the suspect to stand, assume a stance, walk, make a particular gesture, to write for identification; requiring the suspect to appear in a lineup and in court; or *listening to his voice.* (8 Wigmore, Evidence (McNaughton rev. 1961) pp. 387-399.) Nothing in *Griffin* suggests the impropriety of commenting on defendant's refusal to render at least passive cooperation with the foregoing procedures. Indeed, *Griffin* is limited to prohibiting ''comment on the refusal to testify . . . [because it] is a penalty imposed by courts for exercising a constitutional privilege.'' (P. 614.)

I harbor serious doubts as to the ability of peace officers to devise a comprehensible warning, as required by the majority, that will ''distinguish between speech in terms of communication and speech for voice identification, between a refusal to speak free from sanctions and a refusal to speak productive of detrimental inferences.'' If this is too subtle a distinction for laymen, it is equally so for those in the field of law enforcement.

Since we found no self-incrimination problem involved here and *Griffin* is inapplicable, I perceive no bar to affirming the judgment and I would do so.

McComb, J., concurred.