[Crim. No. 11980. First Dist., Div. Two. Aug. 20, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
JOE LEO ALLEN, Defendant and Appellant.

**COUNSEL**

Richard M. Sims III, under appointment by the Court of Appeal, Himelstein, Savinar & Sims, Himelstein & Savinar and Mark Himelstein for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, John T. Murphy and Michael Buzzell, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**TAYLOR, P. J.**—Defendant appeals from a judgment of conviction entered on a jury verdict finding him guilty of robbery (Pen. Code, § 211), assault with a deadly weapon (Pen. Code, § 245, subd. (a)) and possession of a concealable weapon by a felon (Pen. Code, § 12021). He raises a question of first impression in this state as to whether he was deprived of his Fifth Amendment privilege against self-incrimination as a sample of his hair was obtained, admitted into evidence, and used by a prosecution expert. He further contends that: 1) he was deprived of his right to confrontation, as the witness Van Arsdale was improperly impeached; 2) he was subjected to a pretrial identification that violated the standards of *Stovall* v. *Denno,* 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967], and *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; and 3) contrary to Penal Code section 654, he was subjected to multiple punishment. We have concluded that there is no merit to any of these contentions, except the last, and that the judgment of conviction must be affirmed, as modified.

As there are no contentions concerning the sufficiency of the evidence, a brief summary of the pertinent facts will suffice. The complaining witness, Billy McLean, owned a bait and tackle shop in Martinez where Milana Van Arsdale was employed for about three weeks in October 1972. McLean was known to carry large amounts of money in two billfolds: in his left rear pocket, his personal finances; in his right rear pocket, his business receipts. During the time that Mrs. Van Arsdale was employed, a man named Scotty entered the bait and tackle shop and indicated he would sell his boat to the first person who paid him $2,500. McLean reached into his billfold and produced that amount while Mrs. Van Arsdale exclaimed "Oh, my God, all that money."

Mrs. Van Arsdale remained in touch with McLean after she ceased to work for him and one evening arrived at the shop and asked him to take her home. He gave her a ride to a house on Veale Street. On November 29, 1972, he met her while he was on a date. When she asked if he could

see her later that night, he replied he had to take his date home. The following day, November 30, 1972, Mrs. Van Arsdale telephoned McLean three times and arranged to meet him at his shop after he closed for the evening.

Accordingly, about 8 p.m., they left the shop and proceeded to the Redwood Room in Martinez. At this time McLean had both billfolds in his hip pocket and had about $50-$75 in his personal billfold and $850-$1,400 in his business billfold. After two drinks at the Redwood Room, McLean and Mrs. Van Arsdale went to the Paddock Bowl in Pacheco for more drinks, and then to the Golden West Pancake House in Martinez. By this time, it was after 3 a.m. and McLean was too sleepy to drive any farther. Accordingly, they went to the John Muir Lodge across the street from the pancake house. On arriving at the motel, McLean took off his boots and went to sleep on top of the bed.

He was awakened by an intruder armed with a .38 pistol who slapped him in the face and said: "Wake up [expletive deleted], this is a stickup." The intruder was wearing a dark blue ski mask with three holes (one for each eye and one for the nose and mouth) outlined in red and white striping. After McLean rolled over on his stomach and gave the attacker his personal billfold, the robber demanded "the other billfold." McLean then handed over his business billfold. During the attack, Mrs. Van Arsdale stood at the foot of the bed and neither said nor did anything. However, the robber asked her: "Milana, where's his car keys—truck keys?" and Mrs. Van Arsdale told him they had come in the truck.

The robber then indicated that he was going to tie up McLean, and used both hands to do so. McLean realized that the robber had let go of the gun and proceeded to struggle. The robber then shot him and when McLean continued to struggle, the man stated: "Let go of the gun and I won't shoot you again." McLean then fainted and upon reviving a few moments later, looked out the door of the motel room, just in time to see his truck drive away.

The light in the motel room was good and McLean was able to observe the height and weight of the robber. He indicated that the skin of his attacker was light brown and smooth and also testified that defendant was similar in appearance, general build and weight to the robber. He also noted a similarity as to the eyes and voice but noted that defendant used a different tone when he spoke in the courtroom. McLean, however, was not able to make a conclusive identification of defendant as his attacker.

The janitor of the pancake house across the street from the motel had observed McLean and Mrs. Van Arsdale in the restaurant and then leave in a pickup truck for the John Muir Lodge across the road. A few moments later, Mrs. Van Arsdale returned to the pancake house and made a telephone call, during which she said: "Hello, Joe, we're at the motel now. He's loaded. I can't do it by myself." She concluded the conversation by stating: "Well, I'd better get back over there before he gets curious," and returned to the motel.

Police Officer Markwith responded to the report of the shooting about 4:30 a.m. and entered room 11 which had been rented to McLean. An examination of the room revealed two laundry slips dated November 28, 1972, bearing the name of defendant, a number of hairs, four unexpended bullets and one cartridge. Some of the hair samples found in the room were consistent with the hair sample taken from defendant. On cross-examination, however, the expert witness indicated that, unlike fingerprints, no precise identification was possible from hair samples. The bullets at one time had been part of a group of bullets found in a subsequent search of the apartment occupied by defendant's sister and brother-in-law.

Defendant took the stand to testify in his own behalf, admitted the two prior convictions, but denied implication in any of the other offenses charged. Mrs. Van Arsdale was a good friend who often visited defendant, his sister and brother-in-law. Defendant gave her the laundry slips for her leather jacket which he had taken to the cleaners. He also presented an alibi defense. His sister testified that on the evening of November 30, 1972, he was watching television in her apartment adjacent to the apartment defendant occupied with his mother. At 4 a.m. on December 1, 1972, when she received a telephone call from her husband, defendant was asleep on the couch in her living room, and did not wake up until sometime between 8 and 9 in the morning.

■ Defendant for the first time on appeal[1] raises a question of first impression by his contention that his Fifth Amendment rights against self-incrimination were violated when the authorities had him provide a sample of his hair while he was in custody. Subsequently, the criminologist compared it with the hair samples found in the motel room. He testified that some of the hair found in the motel room was consistent with the sample

[1]Although defendant argues that the hair sample and the expert testimony were admitted over a defense objection, no transcript references were provided and we have found none in the record on appeal. In any event, the constitutional question can properly be raised for the first time on appeal (*People* v. *Norwood*, 26 Cal.App. 3d 148, 152 [103 Cal.Rptr. 7]).

of defendant's hair. He admitted on cross-examination that the present state of the art of testing hair presently made identification by hair samples inconclusive, as hair of any individual had a range of distinguishing characteristics.

Although the precise question of hair samples has apparently not previously reached the attention of an appellate court in this state, we are not without sufficient guidelines. It is well settled that the Fifth Amendment of the U.S. Constitution does not apply to physical evidence (*Schmerber* v. *California*, 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826]; *California* v. *Byers*, 402 U.S. 424 [29 L.Ed.2d 9, 91 S.Ct. 1535]; *People* v. *Williams*, 71 Cal.2d 614, 625 [79 Cal.Rptr. 65, 456 P.2d 633]; *People* v. *Ellis*, 65 Cal.2d 529, 533 [55 Cal.Rptr. 385, 421 P.2d 393]). The taking of a hair sample involves physical evidence rather than testimonial compulsion. The invasion of defendant's privacy is minor and no contentions are raised that the hair sample was taken in a physically brutal or a painful manner[2] (cf. *People* v. *Ellis*, 65 Cal.2d 529, 538 [55 Cal.Rptr. 385, 421 P.2d 393]). In *Grimes* v. *United States* (5th Cir. 1968) 405 F.2d 477, 479, the Fifth Circuit Court of Appeals, relying on *Schmerber*, held that the obtaining of hair samples after a lawful arrest, was not a violation of the Fifth Amendment where the means employed are reasonable. We conclude that there was no violation of defendant's self-incrimination rights in the admission of his hair sample.

■ Defendant further argues that as with polygraphs, the method of identification by hair sample was not of sufficient reliability[3] to justify the admission of expert testimony based on the results. As this contention was also not raised below, it cannot be considered here. In any event, since the evidence was inconclusive, its admission was not prejudicial and could have benefited defendant. We conclude, therefore, that the expert testimony concerning the hair samples was properly admitted.

■ Defendant next contends that he was deprived of his right to confrontation[4] as the court admitted, over a defense objection, the testi-

---

[2]The record indicates that defendant here was asked to massage his head and comb it over a sheet of paper with a new comb provided by the officers.

[3]The analogy is not an apt one. Although polygraph evidence has been excluded for lack of reliability (*People* v. *Carter*, 48 Cal.2d 737 [312 P.2d 665]; *People* v. *Schiers*, 19 Cal.App.3d 102 [96 Cal.Rptr. 330]) the real basis of exclusion is that to the extent that a polygraph probes the conscious knowledge of the accused, the responses may be viewed as testimonial (*People* v. *Ellis, supra*, 65 Cal.2d, fn. 9 at p. 537).

[4]Defendant also erroneously asserts that the testimony in question deprived him of his Fifth Amendment right against self-incrimination. However, no right against

mony of Frances Hedrick, the mother of Mrs. Van Arsdale. The record indicates that Mrs. Van Arsdale testified that she pled guilty to a charge resulting from an incident that occurred on December 1 at the John Muir Lodge, and that she was not testifying under any threat or fear with respect to her testimony in the case and had never told anyone else that they would be subject to harm if they testified. Thereafter, she refused to answer any further questions concerning either defendant or McLean or the incident of December 1 on grounds of self-incrimination. Mrs. Van Arsdale reiterated her refusal[5] when recalled during the prosecution's offer of proof in chambers, admitted telling her mother lies about the incident, but denied telling her mother any details.

Thereafter, over defense objection, the trial court admitted the testimony of Frances Hedrick, who testified her daughter had expressed fear for her own safety and that of her family if she testified at the trial, saying "If this man is crazy enough to shoot one man, he's crazy enough to shoot you." When recalled on rebuttal, Mrs. Hedrick indicated that she was afraid of the man who shot McLean, the defendant.

As to the denial of his right to confrontation, defendant, citing *People v. Coleman,* 71 Cal.2d 1159 [80 Cal.Rptr. 920, 459 P.2d 248], and similar authorities, first erroneously asserts that Mrs. Hedrick's testimony was admitted as a prior consistent comment of Mrs. Van Arsdale, pursuant to Evidence Code, section 791. The record, however, indicates that it was admitted as a prior inconsistent statement, pursuant to Evidence Code section 1235. As Mrs. Van Arsdale's prior statement to her mother that she was afraid contradicted her testimony in court, the admission for purposes of impeachment was proper (*People* v. *Williams,* 9 Cal.3d 24, 38 [106 Cal.Rptr. 622, 506 P.2d 998]; *People* v. *Woodberry,* 10 Cal.App.3d 695, 704 [89 Cal.Rptr. 330]). ▮ The admission of a prior inconsistent statement does not violate the confrontation clause provided that the declarant testifies as a witness at the trial. In each case, defendant's opportunity to cross-examine the witness in the particular setting is sufficient confrontation to satisfy the requirements of the Sixth Amendment (*People*

self-incrimination is involved as this right is personal and cannot be raised by another party (*United States* v. *Kordel,* 397 U.S. 1 [25 L.Ed.2d 1, 90 S.Ct. 763]).

[5]As Mrs. Van Arsdale could not remember any details implicating defendant, the contention that her testimony was analogous to the rule of *People* v. *Aranda,* 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], is also not well taken. *Aranda* involved admissions into evidence at a joint trial of the confession of one codefendant that also implicated another. Here, Mrs. Van Arsdale made no statements directly incriminating defendant as she refused to answer any questions indicating that she had been with him or present on the evening in question.

v. *Green,* 3 Cal.3d 981, 985 [92 Cal.Rptr. 494, 479 P.2d 998]). Although Mrs. Van Arsdale's testimony in court was limited, she was available for cross-examination on the matter of her fears for herself and her family. We conclude that there was no denial of defendant's right to confrontation (*People* v. *Barranday,* 20 Cal.App.3d 16, 20-22 [97 Cal. Rptr. 345]). Even assuming error, in view of the uncontroverted evidence of defendant's contacts with Mrs. Van Arsdale on November 28, just before the crime, it is not probable that a result more favorable to defendant would have been reached if Mrs. Hedrick's testimony had been excluded (cf. *People* v. *Parks,* 4 Cal.3d 955, 961 [95 Cal.Rptr. 193, 485 P.2d 257]).

 Defendant next contends that his trial identification by McLean was tainted as he was subjected to an unconstitutional pretrial photographic identification procedure (*Stovall* v. *Denno,* 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967]; *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]). The record, however, indicates that McLean was unable to make a conclusive identification of defendant at either of the preliminary hearings, as well as at the trial, after the voice demonstration.

Defendant's contention is based on McLean's testimony at the preliminary hearing that he remembered being shown only one photograph while he was in the hospital after the crime. At the Penal Code section 1538.5 hearing, however, McLean could not remember how many photographs he had been shown. At the trial, he testified he did not remember seeing the additional photos until they were shown to him at the suppression hearing. Officer Markwith testified that when McLean was in the hospital on December 1, defendant was a suspect. McLean was first shown a group of seven photographs and identified one of defendant as having features similar to the robber. On his next visit to the hospital on December 2, Markwith took only a single and more recent photograph of defendant. McLean was still in a critical condition and again could not make positive identification. Contrary to defendant's contention, as McLean was in a critical condition and not expected to live, there was then an emergency. We do not think the use of the single photograph was unfair. As no conclusive identification was ever made by McLean, it was clearly not prejudicial (*Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]).

 Finally, defendant contends that since the robbery and assault with a deadly weapon were part of an indivisible course of conduct with a single objective, he was subjected to multiple punishment, contrary to Penal Code section 654. The record indicates that while defendant was convicted and given concurrent sentences as to all three counts in the

information, the sentences for assault with a deadly weapon and possession of a weapon by a former felon were stayed, with a stay to become permanent on his completion of the robbery sentence. The People, citing *In re Wright,* 65 Cal.2d 650, 655 [56 Cal.Rptr. 110, 422 P.2d 998];[6] *People v. Niles,* 227 Cal.App.2d 749, 755-756 [39 Cal.Rptr. 11], argue that since the sentences were stayed, defendant was not subjected to double punishment. The People also urge that since defendant possessed the weapon before and after the robbery, that count was a separate and distinguishable offense (*People* v. *Taylor,* 2 Cal.App.3d 979 [83 Cal.Rptr. 119]). Penal Code section 654 prohibits concurrent sentences where the defendant's conduct, although violative of two penal statutes, constitutes an indivisible course of conduct with a single objective (*People* v. *Diaz,* 66 Cal.2d 801, 807 [58 Cal.Rptr. 729, 427 P.2d 505]; *People* v. *Medina,* 26 Cal.App.3d 809, 824 [103 Cal.Rptr. 337]; *People* v. *Solo,* 8 Cal.App.3d 201, 208 [86 Cal.Rptr. 829]). Accordingly, the judgment is reversed insofar as it imposes a sentence for assault with a deadly weapon, and in all other respects, affirmed.

Kane, J., and Rouse, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 17, 1974.

---

[6]*Wright,* however, held, at page 656, that the appropriate procedure at the appellate level is to eliminate the effect of the judgment as to the less severely punishable offense insofar as penalty alone is concerned.