**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**O'Neal WILLIAMS, Defendant-Appellant.**

No. 82–1105.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 27, 1983.

Decided April 8, 1983.

Rehearing Denied May 18, 1983.

**316**

Clyde B. Pritchard, Detroit, Mich., Mark A. Goldsmith, Troy, Mich., for defendant-appellant.

Leonard R. Gilman, U.S. Atty., Ellen Dennis, Asst. U.S. Atty., Detroit, Mich., for plaintiff-appellee.

Before KEITH and KRUPANSKY, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

KRUPANSKY, Circuit Judge.

This is a direct appeal by O'Neal Williams (Williams) from the judgment of the district court entered pursuant to a jury verdict convicting him of an attempt to possess cocaine. 21 U.S.C. §§ 844, 846. Williams charges fifth amendment infringements against self-incrimination when compelled, during his trial, to read a neutral passage from *Time* magazine to the jury for the purpose of voice identification.

The Michigan State Police and the United States Drug Enforcement Agency had jointly investigated certain individuals, including Ronald Conn (Conn) and Paul Arnott (Arnott), and their involvement in the cocaine traffic and related offenses. In early April, 1982, the inquiry culminated with several arrests. On April 4, 1982, federal and state officials executed a warrant authorizing a search of the Conn residence. During the search, Sergeant Robert Bertee (Bertee) of the Michigan State Police answered the resident telephone. At trial, Bertee testified as follows:

Q. What did you say when you picked the phone up?

A. "Hello."

Q. And the party on the other line, what did that person say?

A. Said, "Hello, Paul. This is Jack."

Q. And what did you say?

A. I said, "yeah, Jack."

\* \* \* \* \* \*

Q. After you said, "Yeah, Jack," what did the caller say?

A. At this point, he said, "This doesn't sound like Paul." I told him ... I told him at that time I had a cold, I just got back from Florida.

\* \* \* \* \* \*

Q. What did the caller then say, after you told him you had just come back from Florida?

A. The caller asked if he could come up and pick up an ounce of snow.

\* \* \* \* \* \*

Q. After this caller called and indicated that he wanted to come over and pick up some snow, what did you tell him?

A. I told him to come on up.

Q. Was there anything else said by either of you?

A. No.

Approximately 15 to 45 minutes thereafter Williams entered the driveway to Conn's residence in an automobile. Sergeant Thomas Curtis (Curtis) and Drug Enforcement Agent David MacDougall (MacDougall) confronted Williams and ordered him out of the vehicle. Sergeant Curtis confiscated a weapon partially protruding from under the seat. After Williams identified himself as Jack Williams, and produced a driver's license bearing the identity O'Neal Williams, he was escorted into the Conn residence. When Agent Bertee, who had been conducting a search of an upstairs bedroom, came downstairs and heard Williams speak, he recognized Williams' voice as that of "Jack", the individual who had telephoned earlier. Bertee stated, "You are Jack", to which Williams replied, "Yeah, I'm Jack, Jack Williams." $3,400 was confiscated from the person of Williams, together with a business card. A resident telephone number scribbled on the reverse side of this business card corresponded to the telephone number adjacent to the name "Jack" written on the back of a business card which had been taken from Arnott.

At trial, Bertee described the voice on the telephone as a "distinctive ... gravelly-type voice" with a Southern drawl. After the defense had rested its case, the government moved to introduce an exemplar of Williams' voice as rebuttal evidence "for the purposes of the jury hearing his voice." Over objection, the district court granted the government's motion and compelled Williams to read from a lectern the following passage from *Time* magazine:

> Eighty percent of U.S. Cats are common short-hairs and mixed breeds—'alley cats' of little dollar value. But the price for grand-championship quality Abssinian kittens and some others of the 33 recognized breeds in America can be as much as $3,000. Nearly 400 cat shows were held in the country this year, and some breeders believe the number may reach 450 next year.
>
> Last season the Tony Empire Cat Show in Madison Square Garden—the 'Westminster' of catdom—had to turn away thousands of enthusiasts.

■ Considering the issue of an asserted fifth amendment violation, it is initially observed that fifth amendment proscriptions do not attach where the evidence is not "relat[ed] to some communicative act," *Schmerber v. California,* 384 U.S. 757, 765, 86 S.Ct. 1826, 1833, 16 L.Ed.2d 908 (1966) (blood sample), or of "testimonial or communicative content." *United States v. Dionisio,* 410 U.S. 1, 7, 93 S.Ct. 764, 768, 35 L.Ed.2d 67 (1973) (voice exemplar). The privilege attaches only to testimonial compulsion and not to demonstrative, "physical or real" evidence. *See: South Dakota v. Neville,* —— U.S. ——, ——, 103 S.Ct. 916, 920, 74 L.Ed.2d 748 (1983) (evidence of refusal to submit to a blood-alcohol test does not offend fifth amendment right against self-incrimination); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (handwriting exemplar); *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (voice exemplar); *United States v. Euge,* 444 U.S. 707, 100 S.Ct. 874, 63 L.Ed.2d 141 (1980) (Congress may give Internal Revenue Service power to require taxpayers to furnish handwriting examples); *United States v. Mara,* 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973) (handwriting exemplar); *Holt v. United States,* 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910) (defendant compelled to wear particular clothing).

The Supreme Court has twice proclaimed, in a non-trial context, that the distinctive resonance, speech and voice idiosyncrasies of an individual are identifiable *physical* characteristics, the compelled demonstration of which infringes no interest protected by the privilege against compulsory self-incrimination. *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *United States v. Dionisio,* 410 U.S.

1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973). In *Wade* an individual was compelled, at a pretrial line-up, to state "something like 'put the money in the bag,' the words allegedly uttered by the robber." 388 U.S. at 220, 87 S.Ct. at 1929. No fifth amendment guarantee had been infringed:

> [C]ompelling Wade to speak within hearing distance of the witness, even to utter words purportedly uttered by the robber, was not compulsion to utter statements of a "testimonial" nature; he was required to use his voice as an identifying physical characteristic, not to speak his guilt.

388 U.S. at 222–23, 87 S.Ct. at 1930. In *Dionisio* the Supreme Court adjudged that the compelled production of a voice exemplar as sought by a Grand Jury failed to infringe upon fifth amendment guarantees. This Circuit, as others, has not limited *Dionisio* to the confines of Grand Jury proceedings. In *United States v. Franks,* 511 F.2d 25 (6th Cir.), *cert. denied,* 442 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 693 (1975), this Court upheld the district court's order compelling defendants to produce voice exemplars for the purpose of permitting the government to compare said exemplars through spectrographic analysis to statements which had been tape recorded theretofore by undercover agents:

> We reject Mitchell's attempt to limit *Dionisio* to the grand jury context in that, so long as the underlying seizure of the person is proper, requiring that person to submit voice exemplars violates no constitutional right.

511 F.2d at 32. *Accord: United States v. Woods,* 544 F.2d 242, 263 (6th Cir.1976), *cert. denied* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977), *reh. denied* 431 U.S. 960, 97 S.Ct. 2689, 53 L.Ed.2d 279 (1977). This Court has also affirmed a contempt order issued by a district court against a defendant who refused to produce a voice exemplar as ordered. *United States v. Mitchell,* 556 F.2d 371, 382 (6th Cir.), *cert. denied,* 434 U.S. 925, 98 S.Ct. 406, 54 L.Ed.2d 284 (1977).

The case at bar joins what appears to be an issue of first impression in the federal forum, namely, whether a defendant may be compelled to articulate in the presence of the jury to demonstrate his speech and voice characteristics for comparative purposes.[1] Williams argues that such a mandated demonstration during trial is tantamount to an involuntary disclosure of vocal and physical demeanor patterns which could result in unfavorable jury reactions. Several psychological treatises are submitted to support this argument:

> The emotional state of a speaker reading a neutral passage can be recognized from a tape recording... Thus anxious people speak fast and a breathy way, i.e., with a high frequency distribution and with speech errors. A dominant or angry person speaks loudly, slowly and with a lower frequency distribution.

Argyle, "Non-Verbal Communication in Human Social Interaction" in Hinde (ed.), *Non-Verbal Communication* at 251 (Cambridge Univ. Press, 1972);

> [T]o appear flustered, in our society ... is considered evidence of weakness, inferiority, low status, moral guilt, and other unenviable attributes.

Goffman, *Interaction Ritual,* at 101–02 (Doubleday & Co. 1977);

> [A]ll studies of adults thus far reported in the literature agree that emotional meanings can be communicated accurately by vocal expression.

Davitz, "A Review of Research Concerned with Facial and Vocal Expressions of Emotion," *The Communication of Emotional Meaning,* at 23 (Greenwood Press 1964).

---

1. In *United States v. Brown,* 644 F.2d 101 (2d Cir.), *cert. denied,* 454 U.S. 881, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981), the defendant had been compelled by the trial court to state during trial "give me your money, all your money, or I am going to blow you up" for the purpose of permitting the jury to hear defendant's voice. Justices Moore and Mulligan adjudged that such a compelled display failed to abdicate constitutional guarantees as predicated upon the sixth amendment right to assistance of counsel or upon the fifth amendment right to due process. Justice Oakes dissented. The defendant failed to challenge the in-court voice exemplar as violative of a fifth amendment guarantee against compulsory self-incrimination.

Confronting the issue of "live" voice exemplars as urged by the defendant, it is initially observed that both the federal and state forums have universally adjudged that compelling a defendant to actively cooperate in non-communicative activity in the presence of the jury does not abdicate fifth amendment guarantees. In *United States v. Turner,* 472 F.2d 958 (4th Cir.1973) the Court concluded that no fifth amendment privilege had been compromised when the defendant was required to "put on the wig and sunglasses so that the jury could compare his appearance with photographs of the robber taken by the bank camera":

We find that the demonstration did not violate Turner's right against self-incrimination, because the evidence adduced was real or physical and not testimonial or communicative. *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); * * * The distinction which Turner attempts to draw between in-court demonstrations for the benefit of witnesses and those conducted for the benefit of the jury has no relevance to the issue of self-incrimination, since in both instances the jury observes the demonstration.

*Id.* at 959. *Accord: United States v. Murray,* 523 F.2d 489, 492 (8th Cir.1975) (defendant compelled to wear wig before the jury). *See also: United States v. Satterfield,* 572 F.2d 687, 689–90 (9th Cir.), *cert. denied,* 439 U.S. 840, 99 S.Ct. 128, 58 L.Ed.2d 138 (1978) (court did not abuse its discretion under Federal Rules of Evidence by compelling defendant to wear a mask in the jury's presence). Nor does the practice of directing a defendant to stand in court for the purpose of identification impugn fifth amendment privileges. *United States v. Zammielo,* 432 F.2d 72 (9th Cir.1970); *Peoples v. United States,* 365 F.2d 284 (10th Cir.1966).

The state forums have universally upheld the constitutionality of compelling the defendant to perform various affirmative acts in the jury's presence. *People v. Markley,* 99 Mich.App. 658, 298 N.W.2d 615 (1980) (defendant who did not testify required to appear before the jury in jacket and boots discovered near the scene of the armed robbery); *State v. Woodard,* 387 So.2d 1066 (La.1980) (defendant required to be fingerprinted in the presence of the jury); *State v. Perry,* 291 N.C. 284, 230 S.E.2d 141 (1976) (defendant required to stand before the jury and place an orange stocking mask over his head in the manner that the victim had testified that it had been worn by the individual who had robbed and shot her); *State v. Morgan,* 333 So.2d 642 (La.1976) (defendant required to wear a particular shirt); *State v. O'Connor,* 320 So.2d 188 (La.1975) (defendant required to demonstrate the manner in which he opened a cigarette package); *Urquhart v. State of Arkansas,* 621 S.W.2d 218 (S.C.Ark.1981) (defendant required to remove shirt and exhibit a scar in court); *State v. Stuard,* 104 Ariz. 305, 452 P.2d 98 (1969) (defendant required to give fingerprints in open court); *State v. Williams,* 307 Minn. 191, 239 N.W.2d 222 (1976) (defendant required to wear hat in court to allow jury to compare his appearance with a photograph of the robber).

Several state courts have addressed the precise issue joined in the action *sub judice.* In *Lusk v. State of Florida,* 367 So.2d 1088 (Fla.App.1979) the practice of compelling a defendant to speak in court for the purpose of allowing a witness to identify defendant's voice was adjudged non-violative of fifth amendment principles. Similarly, in *Coffey v. Arkansas,* 261 Ark. 687, 550 S.W.2d 778 (1977) the Supreme Court of Arkansas upheld, upon fifth amendment challenge, the lower court's mandate that defendant stand and speak the word's "This is Kenney Coffey" for the purpose of permitting a witness to determine if the voice on the telephone was the same voice as defendants.[2] The Court of Appeals of Ore-

---

**2.** The non-communicative nature of live exemplars was emphasized.

[T]he speaker is asked, not to communicate ideas or knowledge of facts, but to engage in the physiological processes necessary to produce a series of articulated sounds, the verbal meanings of which are unimportant. The sounds alone are elicited for identification

gon, in *State of Oregon v. Reynolds,* 603 P.2d 1223, 43 Or.App. 619, *aff'd,* 614 P.2d 1158, 289 Or. 533 (1979) upheld as "testimonial in nature" the trial court's requirement that the defendant state to a witness, for purposes of voice identification, the words used in the robbery, to wit, "Don't anyone move, everybody lie down on the floor." In *State v. Lacoste,* 256 La. 697, 237 So.2d 871 (1971) the defendant was compelled to state "hurry up" at trial, the language used by the robber. The Supreme Court of Louisiana addressed the *defendant's* right to provide the jury with a "live" voice exemplar without subjecting himself to cross-examination and thereby use the fifth amendment as a sword rather than a shield. *State of Louisiana v. Tillett,* 351 So.2d 1153 (S.C.La.1977). The court adjudged that since the state could have ordered the defendant to speak without violating fifth amendment guarantees, principles of due process permitted the defendant to provide non-testimonial speech without exposing himself to cross-examination.

■ This Court rejects Williams' theory that a "live" voice exemplar may generate testimonial demeanor evidence and is therefore *per se* unconstitutional. Demeanor typically impacts as a crucial jury inquiry only when a witness offers testimonial evidence, thereby injecting his credibility into issue. In contrast, a defendant compelled to give a live voice exemplar is not a witness for purposes of evolving testimonial evidence. A compelled reading of a neutral passage fails to join the defendant's credibility in issue and the defendant's demeanor axiomatically fails to become relevant or material to the ultimate issue of guilt or innocence.

History has documented that our federal system of criminal jurisprudence is not so frail that justice may not be served unless the jury is prevented from witnessing the defendant's appearance and resulting demeanor at trial. Indeed, the right of a

defendant to attend trial and confront his accusers is an integral and historic cornerstone of the judicial process. Whatever intangible demeanor "evidence" a jury may acquire from a demonstrated live voice exemplar is indistinguishable from that which it may gain from daily observations of defendant during the trial. The added visual dimension incidental to a live voice exemplar is merely cumulative.

Poor reading or speaking skills, accents, speech defects, emotional state and/or other voice or personality idiosyncrasies displayed to a jury during the course of the "live" voice exemplar are equally manifested irrespective of whether the exemplar is procured outside or within the presence of the jury. The very psychological treatise submitted by Williams acknowledges this principle: "The emotional state of a speaker reading a neutral passage can be recognized from a *tape recording.*" *Argyle, supra.* The live exemplar compelled in the case at bar is indistinguishable, for purposes of fifth amendment analysis, from those non-live voice exemplars proclaimed as constitutional in *Dionisio* and in this Circuit's subsequent decisions. *See: United States v. Franks, supra; United States v. Woods, supra; United States v. Mitchell, supra.* The proscriptive parameters of compulsion to submit a live voice exemplar are products of evidentiary rules and judicial discretion rather than of constitutional dimension. Accordingly, this Court rejects the petitioner's fifth amendment assignment of error.

Williams secondly contends that the district court erred in denying a motion for judgment of acquittal as predicated upon the proposition that the acts ascribed to him failed to constitute a criminal attempt. Viewing the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), *United States v. Conti,* 339 F.2d 10 (6th Cir.1964), it is apparent that (1)

purposes through characteristics such as pitch, tone intonation, accent, and word stress. The speech patterns of individuals are distinctive physical characteristics that serve to identify them just as do other physi-

cal characteristics such as color of eyes, hair, and skin, physical build and fingerprints. 550 S.W.2d at 779, citing *People v. Ellis,* 65 Cal.2d 529, 55 Cal.Rptr. 385, 421 P.2d 393 (1966).

Williams telephoned Conn's residence and, assuming Bertee was Arnott, inquired whether he could purchase an ounce of "snow"; (2) Williams was informed to "come on up"; (3) approximately 15–45 minutes later Williams arrived at Conn's residence with a revolver and $3,400, whereupon an arrest was effected. It can be inferred from the record that Williams possessed adequate funds to conclude a narcotics transaction.

■ The two requisite elements of an attempt are (1) an intent to engage in criminal conduct and (2) the performance of one or more overt acts which constitute a substantial step towards the commission of the substantive offense. *United States v. Manley,* 632 F.2d 978, 987 (2d Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981). *See also: United States v. Mandujano,* 499 F.2d 370, 376 (5th Cir.1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975); *United States v. Jackson,* 560 F.2d 112, 118–19 (2d Cir.), *cert. denied,* 434 U.S. 941, 98 S.Ct. 434, 54 L.Ed.2d 301 (1977); *Mims v. United States,* 375 F.2d 135, 148 (5th Cir.1967); *United States v. Busic,* 549 F.2d 252, 257, n. 9 (2d Cir.1977); *United States v. Phillips,* 664 F.2d 971, 1037 (5th Cir.1981), *cert. denied sub nom. Myers v. United States,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *United States v. Alvarez,* 610 F.2d 1250, 1254 n. 3 (5th Cir.1980), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981). In the case most factually analogous to the action *sub judice,* sufficient evidence was adjudged to have supported a conviction for attempt to possess narcotics where the defendant was present in a residence of an acquaintance where cocaine was discovered and the defendant possessed a sum of currency roughly equivalent to the purchase price of a quantity of cocaine discovered upon a scale. *United States v. Manley, supra.* In the case at bar, Williams actively solicited a narcotics sale by telephone and within a short time interval voluntarily appeared at the Conn residence with a weapon and a substantial amount of cash to consummate the purchase from the cache of cocaine Arnott had recently trans-

ported to Michigan from Florida. In the absence of police intervention, Williams would have consummated the same overt acts as had the defendant in *Manley.* This Court adjudges that the conduct ascribed to Williams was of sufficient weight to support a criminal attempt. *Cf. United States v. Joyce,* 693 F.2d 838, (8th Cir.1982) (defendant's conduct evidenced that any intent which had existed had been affirmatively abandoned).

Thirdly, Williams asserts that the district court improperly excluded exculpatory evidence. Williams advised the Court that the testimony of Marie Ogden (Ogden), an Internal Revenue Service employee, would be offered for the purpose of proving the defendant owned $3,300 in overdue taxes and had expressed an intent to repay the same. Ogden's testimony, it is argued, would have provided the jury with an alternate explanation for the $3,400 taken from Williams. The defendant proffered that Ogden would testify that approximately two months prior to the date of the alleged offense in February, 1981, Williams stated, during a telephone conversation with Ogden, that "*If my mother sells the house and she gives* [the money] *to me, then* I will bring it." In conjunction with this proffered testimony, Williams noticed the Court that no evidence would be presented to establish that his mother had actually sold her house or intended to give him the proceeds of the sale or had actually given him any money. The Court, subsequent to characterizing Ogden's testimony as hearsay and lacking in relevance, excluded the proffered testimony.

Ogden's testimony was offered under Rule 803(3), Fed.R.Evid.:

A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as *intent,* plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will. (emphasis added)

**322**

Rule 803(3) "statements" are not excluded by the hearsay rule even though the declarant, in this case Williams, is available as a witness. A statement of *intent* to perform a future act is a state of mind exception to the hearsay rule. *Mutual Life Insurance Co. v. Hillmon,* 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892); *United States v. Hoffa,* 349 F.2d 20, 45 (6th Cir.1965), *aff'd,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), *reh. denied,* 386 U.S. 940, 87 S.Ct. 970, 17 L.Ed.2d 880 (1967). Accordingly, Ogden's testimony reflecting the defendant's intent to perform the future act of paying overdue taxes in the amount of $3,300 could not be excluded as hearsay testimony.

However, Ogden's testimony concerning the defendant's intent to perform a future act was affirmatively qualified by two conditions subsequent, namely, the sale of his mother's house and a gift of the proceeds received from the sale to Williams to satisfy the tax indebtedness. Since Williams advised the Court that no evidence supporting the occurrence of either of the conditions would be presented from which the jury could infer that he was capable of acting upon the expressed intent in a manner consistent with the conditions, the district court did not abuse its discretion in precluding Ogden's testimony.

The district court did not abuse its discretion by admitting into evidence the weapon which had been retrieved from Williams' automobile. *See: United States v. Marino,* 658 F.2d 1120 (6th Cir.1981).

The judgment of the district court is AFFIRMED.